The plaintiffs were entitled to recover on the ground that the wife took the land, either as devisee or as heir at law, unless my brethren are right in saying, that the testator intended, by the fourth clause of the will, to give a trust estate to the executors for the lives of the two daughters. If such was his intention, the question arises, whether the trust — which is one to receive and pay over the rents and profits of lands — is a valid trust under the third subdivision of the 55th section of the statute of uses and trusts. As the trust, if a good one, separates the legal from the equitable estate, and suspends the power of alienation, it is important that the point should be well considered. The same question, among others, was before us in the case of Mason v. Jones, upon the will of the late John Mason of the city of New-York, who left a very large estate. He attempted to create a trust to receive the rents and profits of lands, and pay certain annuities. After the case had been before us more than a year, it went off at the last May term upon an equal division of opinion among the judges, without deciding the point. Although the two cases differ in some particulars, yet, so far as relates to this question, the principle to be settled is the same in both; and the opinion which I prepared on this branch of the Mason case will, for the most part, be equally applicable on the present occasion. It was as follows:
The statute authorizes a trust "to receive the rents and profits of lands, and apply them to the use of any person." (1R.S. 728, § 55.) Whether, under this provision, a valid trust can be created to receive rents and profits, and pay them over
to the beneficiary, is a question which has undergone a good deal of discussion in the books. In favor of the validity of such a trust will be found the names of Chancellor Walworth, Judge Nelson and Senator Tracy. (Gott v. Cook, 7 Paige, 536;Coster v. Lorillard, 14 Wend. 331, 394.) On the other side of the question are the names of Chief Justice Savage, Senators Maison and Young, and my own. (Coster v. Lorillard, 14Wend. 320, 351, 377; Hawley v. James, 16 id. 156.) And still the question *Page 322 
remains open. It is a very great error to suppose that the validity of such a trust was established by the decision of the court of errors in Kane v. Gott, (24 Wend. 641;) for the court was careful not to meddle with the question. In that case the lands were directed to be sold and converted into personal property, and the decision was put upon the ground that it was a trust of personal property; and that the statute of uses and trusts, which relates exclusively to real property, had nothing to do with the case.
The question not only remains open, but every lawyer has known from the time the case of Coster v. Lorillard was before the court in 1835, that the judges were divided in opinion, and that the question had got to be settled by the court of last resort. In nearly all cases where wills have been made since that time, so far as I have either observed, or have learned from conversing with gentlemen conversant with such matters, the testator, if he wished to create a trust of this kind, has followed the words of the statute, and made a trust to receive and apply rents and profits. When that has not been done, especially in disposing of large estates, where wills are not often prepared without the aid of counsel, it is but reasonable to suppose that the testator preferred to take the hazard of having the provision declared void, rather than make such a trust as the statute mentions. But whatever may have been the mind of this testator, we must inquire whether the trust which he has made is authorized by law.
The opinion which I expressed on this question in Hawley v.James not only remains unchanged, but the more I have heard the matter discussed, and the more frequently it has been turned in my own mind, the more thoroughly am I convinced that such a trust as the testator has attempted to create cannot be supported. I shall not repeat, on this occasion, what I said in Hawley v.James, nor what has been said by other judges on the same side of the question. I shall do little more than suggest a few leading thoughts, and notice some of the most prominent arguments on the other side of the question.
It should be constantly borne in mind, that there is no longer any common law right to create trusts of real property. The *Page 323 
legislature has abolished all trusts, save such as it has specially authorized; (§ 45;) and if the authority to make this trust cannot be found in the statute, it does not exist.
The testator has not followed the statute, either in form, or in legal effect. He certainly has not followed the words; and that is a matter of some importance in a case like this, where the legislature has so plainly declared the purpose of restricting trusts of real property, and confining them within certain specified limits. If there may be any departure from the language of the statute, it must be at the peril of failure, unless the words used are precisely equivalent to those prescribed by the legislature.
But we need not lay much stress upon mere words, for the legal effect of the statute has been disregarded by the testator. There is, in my judgment, a very plain and substantial difference between the statute trust, to receive rents and profits andapply them to the use of another, and such a trust as the testator has made, to receive rents and profits, and pay themover as a debt due to another. In one case, the trustee has a discretion in the application of the money; in the other he has none. Looking at the whole scope of the statute of uses and trusts, I cannot think that the legislature intended to authorize a trust which would suspend the power of alienation, without any discretion or authority in the trustee to direct the application of the trust money. I do not mean that the trustee must himself "purchase every loaf of bread, and every paper of pins" which thecestui que trust may need; (7 Paige, 537;) but I do mean, that the trustee must have the right to determine for what purposes the money may be expended, and to make the application himself, where he thinks those matters cannot, either in whole or in part, be safely intrusted to the beneficiary. If this trust had been created in the words of the statute, to receive and apply rents and profits; or in any other truly equivalent words, no one can doubt that the trustee would have had the right to control the expenditure of the money. But under the trust which the testator has made, the trustees have no power whatever over the expenditure of the money; but are bound to pay it over in gross sums as debts due to the beneficiaries. That *Page 324 
would be well enough if the testator had created a trust under the second subdivision of the 55th section, which would not suspend the power of alienation. (16 Wend. 152.) But he has made a trust under the third subdivision of the section for the very purpose of tying up the property; and yet has not followed the only authority for making such a trust.
It is true that the statute does not, in terms, say that the trustee must have a discretion concerning the application of the money. But it does speak of a trust to receive rents and profits; a trust to apply them to the use of another, and atrustee to do the business; and it is impossible to deny that this language plainly and necessarily implies a power and discretion in the trustee to direct and control the application of the money.
It is said that the donor may direct the application of the money. I answer, that the statute does not say so. On the contrary, it provides for a trust to apply, and a trustee to make the application.
It is also said that there may be cases where the beneficiary will not be capable of managing the estate from which the rents and profits are to arise, and yet will be quite competent to expend the money with discretion; and in such cases, the only useful trust is that for managing the property and collecting the rents and profits. Should that be granted, it would prove nothing to the present purpose; for the legislature has not authorized a trust to receive only, but a trust to receive and apply. And besides, there is much less occasion for a trust to manage the estate — a thing which may be done by an attorney or agent — than there is for a trust to apply the rents and profits to the use of the beneficiary. If he is competent to expend the money with discretion, he will undoubtedly be able to appoint a proper agent to manage the property; and there will be no occasion for a trust for any purpose. But it is enough that the legislature has coupled the two things together; and where there is no authority to apply the rents and profits, there is no such trust as the statute allows
It is said that paying the money to the beneficiary is one mode of applying it to his use. But this argument does not prove enough; for the trust authorized by the statute is one to *Page 325 
apply generally, and includes, not one only, but all legitimate modes of making the application. And besides, there may be cases where paying any considerable portion of the money to the beneficiary would not be applying it to his use, within the meaning of the statute. If he is a lunatic, or is spending the money in gaming and drunkenness, while his wife and children are suffering from cold and hunger, it would be a breach of the statute trust to put the money into his hands. And yet under the trust we have here, the trustee could not withhold a single dollar, and apply it himself to the relief of the suffering family. I know it has been said, that although the trust be to pay over, the trustee may nevertheless exercise a discretion, and withhold the money from a lunatic or a drunkard; and that the court of chancery would protect the trustee in doing so. (Gott
v. Cook, 7 Paige, 538, 9.) But I deny that the court of chancery has any such power. If it is a lawful trust the beneficiary may compel the execution of it. If it is not lawful, it must fall for that reason. Chancery has no power to get rid of the difficulty by making a new trust, instead of the one which was made by the donor. This was frankly admitted, and thedictum in Gott v. Cook given up, by the counsel who argued in support of this will.
I will notice, in this connection, that creditors are provided for in certain cases; (§ 57;) and when the statute is followed in making the trust, the trustee will have the right to prefer the claims of honest tradesmen, mechanics and laborers, to the demands of harlots, gamblers and sharpers. But where the trust is to pay over, the trustee has no such power.
It is true that the statute has not confined the trust to any particular description of beneficiaries, as infants, femes covert, drunkards, spendthrifts, or the like. But it is also true that no one will be likely to create such a trust as the statute authorizes, unless there is some reason growing out of the condition, character, or habits of the beneficiary, calling for the intervention of a trustee. The legislature evidently intended to confine trusts which suspend alienation within narrow limits; but they thought it better to do so by giving a special character to the trust, rather than by undertaking to describe all the different *Page 326 
classes of persons for whose benefit the trust might be created. If an attempt had been made to specify, it might often become a question whether the beneficiary was within the description. It was, therefore, left for the benefactor to decide for himself who should be the object of his bounty, provided he made a trust to receive and apply. It was said, on the argument, that the beneficiary might often feel himself degraded by such a trust. As the trustee will always be the friend of the donor, and probably of the beneficiary also, there is very little reason to suppose that he will use his power in an unreasonable or offensive manner. But however that may be, the answer to the argument is, that if the beneficiary does not like such a trust as the law allows, he can let it alone. He is not obliged to have it.
The legislature has not limited the amount of property which may be conveyed in trust, nor the income to be derived from it. But this proves nothing in favor of a trust to pay over. It only proves that the legislature was willing to leave the donor free from all restraint, except such as results from the nature of the trust. He may make the gift as large as he pleases; but it must be upon such a trust as the statute allows. If that wounds the pride of the rich beneficiary, he must either bear it, or renounce the trust.
There is room for question whether a valid trust to provide for annuities can be created under the third subdivision of the 55th section. When the object is to provide for legatees, by paying them gross sums of money, the trust should be under the second subdivision. It should not be a trust to receive rents and profits, which suspends alienation; but a trust to sell, mortgage or lease lands, which does not interfere with the marketable quality of the property. (16 Wend. 152.) But if a good trust for annuities can be created under the third subdivision, the trustee must have the right to apply the money, instead of being obliged to pay it over, as the testator has directed in this case.
It is not the policy of our law to enable men to tie up their estates, where no valuable end is to be attained by it. When the circumstances of the case are such as to call for the intervention of a trustee to manage the property, and apply the income *Page 327 
to the use of another, a trust suspending alienation has been allowed. If that trust shall be so extended by construction as to include cases where the trustee has no control over the money, it will enable men to fetter their estates, when no useful end is to be answered by it, and where they could not do it before this statute was passed. At the common law a trust to receive and pay rents and profits would not suspend the power of alienation. If we approve of this will, the legislature, instead of restricting trusts which tie up estates, has enlarged them to an almost unlimited extent. The shackles upon alienation will be more effectual than they were before the revolution: men who have gathered large fortunes, will have the means of gratifying the too common desire of controlling the property after they are dead: the passion for accumulation, already strong enough, will be stimulated; and the causes which are now constantly performing the office of agrarian laws will, in a great degree, be counteracted. In England, the efforts of the landed aristocracy to tie up estates were constantly resisted by the judges, who went so far in the opposite direction as nearly to repeal the statute de donis conditionalibus by construction. Our statesmen and legislators have given us no occasion for such a struggle; for instead of making laws in restraint of alienation, they have unfettered and promoted the distribution of estates, by abolishing entails, primogeniture and passive trusts; and finally, by abolishing feudal tenures of every description, with all their incidents. We cannot, I think, uphold this trust without forgetting the spirit of our institutions, and making a retrograde movement.
And finally, where the words of the statute are followed, and the trust is to receive and apply rents and profits, I have never yet met with any judge or lawyer who denied that the trustee had authority to make the application of the trust money. The trust which the testator has made gives no such right. It is not, I think, too much to ask those who say this is a good trust, to tell us how it is that a trust which does not follow the statute, either in form or effect, can be valid. That question has never yet been answered.
So much for my opinion in the Mason case. It is a remarkable *Page 328 
fact that under different organizations of the court, the judges were twice equally divided in opinion on this question. The Mason case was first argued in April, 1848, when Judges Ruggles, Gardiner, Jones and Johnson, thought the trust was good; while Judges Jewett, Wright and Gray, agreed with me that it could not be supported. After four of those judges had given place to four others from the supreme court, the case was again argued in January last, when Judges Ruggles, Gardiner, Shankland and Hoyt were for upholding the trust; and Judges Jewett, Strong and Cady, concurred with me in the opinion that it was void.
On the argument of the case now before us, the counsel for the defendant insisted, that the validity of such a trust was adjudged by the court of errors, on a division of ten to eight, in the case of Parks v. Parks, which was decided in December, 1842. The evidence which the counsel furnished of the fact, was a copy of the error book, points and decree; from which it appeared that the chancellor decided in favor of a will containing a similar trust; and although objection to it was made by counsel in the court of errors, the decree was affirmed. If there was nothing to controvert this evidence, it would not be very satisfactory, because it may well be that the case was disposed of by the court of errors on some other ground. The very same kind of evidence, and that which is fully equal to it in degree, may be found in the case of Gott v. Cook, (Paige, 521,) where the chancellor decided in favor of such a trust; and though objection to it was distinctly taken by counsel in the court of errors, the decree was affirmed. (Kane v. Gott, 24 Wend. 641.) But on looking at the report in error it will be seen, that the court carefully abstained from deciding the point in question, and held the will valid on another ground. And such I have no doubt was the fact in Parks v. Parks, which was upon a complicated and very badly drawn will. From the report of the case in the court of chancery, (9 Paige, 107,) it appears that the chancellor was of opinion that most, if not all of that part of the will which he upheld, might stand as a good disposition of legal estates to the beneficiaries, without any trust; and the court of errors probably went upon that, or some *Page 329 
such ground, in affirming the decree, without touching the question under consideration. The fact that the case in error has not been reported, furnishes evidence nearly, if not quite conclusive, that the validity of such a trust as we have here was not considered. The question was one of unusual importance: it had been debated at the bar and on the bench, for several years; and had it been decided either way by the court of errors while sitting at the capitol, the decision would not only have found its way into the books in due time, but it would have been announced in the city papers the next day, and been published all over the state within a week. And yet, although nearly seven years have elapsed since the supposed decision was made, during which time the question has still been mooted in the courts, it does not appear that any one ever heard of such a decision by the court of errors, until the fact was stated by the defendant's counsel on the argument of this cause. No opinions are produced; no judge, senator, reporter, counsel, or attorney, testifies that the point was considered; and I think it morally certain that it was not decided.
I think the judgment of the superior court should be reversed; and Judges JEWETT and STRONG concur in this opinion. But as my brother CADY surrenders his own opinion to the supposed authority of Parks v. Parks, there is a majority in favor of affirmance. And thus it happens that a great question, which has been litigated more than fifteen years, is at the last settled by a single vote, and that vote governed by a supposed decision which I verily believe was never made.
Judgment affirmed. *Page 330